FILED

1  JOSEPH S. FISCHBACH (SBN 70830)
      Fischbach & Fischbach
2      A Law Corporation
   9300 Wilshire Blvd. Suite 308
3  Beverly Hills, California  90212
   Telephone: (310) 278-4015
4  Facsimile: (310) 278-2894
   Email: jsf2@fischbachlaw.com

10 MAR -3  PM 2: 33

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

5
   Attorneys for Plaintiff
6  Congregation Etz Chaim and
   Congregation Etz Chaim of Hancock Park
7

8                 UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11 CONGREGATION ETZ CHAIM, an          CASE NO. CV10- 01587-R CRCx
   unincorporated association and the
12 individual members thereof;
   CONGREGATION ETZ CHAIM OF          COMPLAINT FOR
13 HANCOCK PARK, a California non-     DECLARATORY, INJUNCTIVE
   profit corporation,                AND MONETARY RELIEF;
14                                     DEMAND FOR JURY TRIAL
                  Plaintiffs,
15                                     Related Case: CV 97-5042 CAS (Ex)
          v.
16                                     The Hon. Christina A. Snyder
   CITY OF LOS ANGELES,
17                                     Courtroom: 5
                  Defendant.
18

19

20

21      Plaintiffs Congregation Etz Chaim, an unincorporated association, and the

22 individual members thereof, and Congregation Etz Chaim of Hancock Park, a

23 California non-profit corporation (collectively, "the Congregation" or "Etz

24 Chaim") by their undersigned attorneys, bring this action for declaratory,

25 injunctive and monetary relief pursuant to the Religious Land Use and

26 Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc et seq. ("RLUIPA").

27 By this Complaint, the Congregation alleges as follows:

28

# I.

## INTRODUCTION

1.  Congregation Etz Chaim brings this action for declaratory, injunctive and monetary relief for violation of its Federal Civil Rights of religious freedom arising from the City of Los Angeles' (the "City") denial of the Congregation's application for a Conditional Use Permit ("CUP"). The Congregation is a small group of Chassidic Orthodox Jewish residents of Hancock Park, who, for nearly fifty years, have gathered together in one of two residences in Hancock Park for communal prayer in accordance with the dictates of their religion. Orthodox Jewish Law prohibits worshipers from driving to services on the Sabbath (Friday night and Saturday until sunset) and on other high holy days. Indeed, the Congregation was formed precisely because many of its members are elderly, disabled or have young children and thus are physically unable to walk to prayer services held at more distant synagogues in the commercial zone.

2.  In or around 1994, the owner of the original residence in which prayer services were held became too elderly to host them. The Congregation's leader, Rabbi Chaim Baruch Rubin, thus began a search for a new location for the Congregation to meet and pray. The primary requirements for the new location were that it be within walking distance of the congregants' homes and have the least possible impact on the Hancock Park community. Rabbi Rubin found a house at 303 South Highland Avenue which fit both of these requirements. It is within walking distance for all congregants, and has little impact on the community as it is close to the western-most edge of Hancock Park on the corner of two secondary highways, and one of the busiest intersections in the community, with a traffic volume of over 80,000 cars per day.

3.  The Congregation held services at the 303 South Highland residence for two and a half years, with no complaints from neighbors and with the full knowledge and tacit consent of community leaders. During this time, the

Congregation invited the Hancock Park Homeowners' Association (the "Association") to the Highland Avenue location in order to allow them to see firsthand the Congregation's activities and new location. At that time, the Congregation expressed its willingness to address all the homeowners' concerns. Several months later, however, the Association objected to the use.

4.     Although the Congregation's house of prayer is located in a residential zone, the zoning ordinance expressly allows church uses by conditional use permit. The Congregation thus applied for a CUP, but it was categorically denied by the City, not because of any adverse impacts created by the use of the residence for prayer services, but rather, because the community of Hancock Park had purportedly never granted a CUP for church uses and did not want to "set a bad precedent" by allowing such uses in the community. The City, therefore, refused to allow the Congregation to avail itself of the conditional use process by finding no "church uses" would be permitted anywhere in Hancock Park, ever. The City so found notwithstanding that other similar group associational uses, which have the same or greater impacts on the community, such as schools, private clubs, and recreational facilities are allowed in Hancock Park by CUP. In addition, secular uses virtually identical in scope to the Congregation's use, such as book clubs, political and charitable fundraising events and large parties are all permitted in Hancock Park without a CUP.

5.     The Congregation thereafter brought an action in this Court for declaratory relief and injunctive relief pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, Title VII of the Civil Rights Act of 1968, 42 U.S.C. § 3604, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, claiming, *inter alia*, that the City's demand for and categorical denial of the Congregation's application for a CUP to allow prayer services at 303 South Highland violated the Congregation's federally guaranteed statutory and constitutional rights of religious freedom. See

1   <u>Congregation Etz Chaim v. City of Los Angeles</u>, Case No. CV 97-5042 (HLH)

2   ("First Action").   The First Action was stayed pending resolution of the

3   Congregation's state law claims.

4        6.     After the state law claims were denied, the Congregation amended its

5   federal complaint to add claims under the newly passed RLUIPA, which was

6   enacted to remedy widespread and systematic discrimination in discretionary land-

7   use decision making processes as evidenced by a substantial congressional

8   evidentiary record of nationwide examples of religious discrimination, including,

9   notably, the City's refusal to grant the Congregation's CUP in this case.   The

10  Congregation's claim that the City's demand for and denial of the CUP constituted

11  a substantial burden on the Congregation's rights of religious freedom in violation

12  of RLUIPA survived the City's motion for judgment on the pleadings and was set

13  for pretrial conference in June of 2001.

14       7.     On September 27, 2001, after several Court-Ordered Settlement

15  Conferences, the City and the Congregation settled the Congregation's RLUIPA

16  claims and the lawsuit against the City was dismissed with prejudice.   The parties

17  entered a Settlement Agreement and Release (attached hereto as Exhibit A), which

18  provided that, subject to certain strict restrictions on the nature and scope of

19  religious use, and subject to certain conditions on the remodeling of the residential

20  structure, the Congregation could hold prayer services in accordance with the

21  dictates of its Chassidic Orthodox Jewish faith at 303 South Highland.   The

22  Settlement Agreement expressly provided for limited private religious use of 303

23  South Highland – it did not purport to allow (nor did the Congregation seek to

24  operate) a full-blown institutional synagogue, which requires a CUP.   In exchange

25  for the limited right to pray in Hancock Park, the Congregation released its

26  RLUIPA claims, including its right to seek attorneys' fees and appeal.

27       8.     The Settlement Agreement was approved by the full City Council,

28  and by this Court, which retained continuing exclusive subject matter jurisdiction

over its enforcement.  The City issued building permits, the validity of which was upheld by the Ninth Circuit Court of Appeals (Congregation Etz Chaim v. City of Los Angeles, 371 F.3d 1122 (9th Cir. 2004)), and the Congregation remodeled the residence pursuant to the Settlement Agreement's terms.  Thereafter, and ever since, the Congregation has gathered to pray in accordance with the express terms of the Settlement Agreement.   With the City's approval, the Congregation expended substantial sums in remodeling the residence, and many families relocated to Hancock Park to be within walking distance to the *shul*.  The City, for its part, defended the Settlement Agreement and the limited religious use it allowed, never cited the Congregation for exceeding the scope of its terms, and consistently maintained that no CUP was required for the private prayer services.

9.     Thereafter, a group of Hancock Park residents called the League of Residential Neighborhood Advocates ("LRNA") invoked this Court's continuing enforcement jurisdiction and brought a second action (League of Residential Neighborhood Advocates v. City of Los Angeles, Case No. CV 03-04890 (CAS) ("LRNA Action")) challenging the validity of the Settlement Agreement on a number of federal and state law grounds.  In July 2004, this Court rejected LRNA's collateral attacks on the Settlement Agreement, noting among other things, that the Settlement Agreement was duly authorized by the City's own City Charter and approved by the City Council, and did not contravene provisions of the Los Angeles Municipal Code ("Municipal Code").   The City joined the Congregation in opposing LRNA and defending the Settlement Agreement.

10.     In August 2007, the Ninth Circuit Court of Appeals reversed, granted LRNA's collateral challenge, and remanded to allow the City to consider and formally approve through the public administrative conditional use process the same limited religious use the City allowed in the Settlement Agreement, or, alternatively, for a judicial determination of whether the City's refusal to allow the Congregation to pray at 303 South Highland without a CUP (and the concomitant

denial of the CUP application) has or will result in an "actual violation" of RLUIPA. The parties opted to seek CUP approval, rather than a judicial ruling.

11.   The Congregation submitted a supplemental application for a CUP, seeking approval through the CUP process of the same use the City allowed in settlement since 2001. The Congregation did not seek a CUP for a full-blown institutional synagogue use, and, in fact, maintained that no CUP was required under local law or RLUIPA. Despite its prior express and unequivocal approval of the Congregation's limited use and remodeling of the residence (including, notably, the reduction of on-site parking to two spaces), the City categorically denied the Congregation's application for a CUP on grounds nearly identical to those it asserted in 1996. See Decision Denying CUP, attached hereto as Exhibit B. The City failed to consider any mitigation measures, or additional restrictions on the Congregation's use. It failed to adduce any objective evidence in support of its outright ban. Instead, despite several years of daily prayer services without a single citation, and unsupported by a single traffic or noise study, the City denied the CUP on the grounds that, *inter alia*, allowing Jewish communal prayer services would set a bad "precedent" for future uses; would be detrimental to Hancock Park's "well-established" historic character and its mission "to protect and improve the status quo"; and that the elderly and infirm congregants should be compelled to walk the additional distance to some unidentified house of worship in the commercial zone. The City refused to grant the Congregation's application for a parking variance to formally legalize the two spaces the City previously demanded in settlement and approved by permit, only to assert the lack of parking and concomitant traffic impacts as another basis for disallowing the use.

12.   By demanding and categorically denying the CUP, the City now effectively seeks to shut down the Congregation's house of prayer and to prohibit its members from gathering together to worship in Hancock Park. If the house of prayer is shut down, many of the congregants, especially the elderly, infirm, and

those with young children, will no longer be able to attend communal prayer services on the Sabbath as required by the dictates of their Chassidic Jewish Orthodox faith.  In summarily and arbitrarily refusing to consider any action short of outright denial of the Congregation's CUP, by forcing without lawful justification elderly and infirm congregants who are physically incapable of walking the additional distance to the commercial zone to abandon or violate their religious beliefs, and by effectively enacting an outright ban on permitting conditional church/synagogue uses in Hancock Park, the City has violated the Congregation's federally protected civil rights under RLUIPA.  By arbitrarily and without basis in fact or evidence refusing to permit the same religious use the City previously approved and defended, the City now intends to shut down the Congregation for purely political reasons in violation of RLUIPA.

13.     This action is ripe for judicial review, as the Central Area Planning Commission ("CAPC") has denied the Congregation's appeal from the denial of the CUP, and the City's administrative appeal process is final.  Pursuant to this Court's May 5, 2009, Order (attached hereto as Exhibit C) dismissing the First Action without prejudice, the RLUIPA claims are now prudentially ripe.

14.     The Congregation therefore requests an injunction prohibiting the City from enforcing the zoning ordinance against it, that the City's denial of the Congregation's CUP be set aside as null and void under RLUIPA, and that damages be awarded according to proof.

## II.

## JURISDICTION AND VENUE

15.     Jurisdiction in the Federal Court is proper under 28 U.S.C. § 1331 because the instant matter involves the application of a Federal Statute, to wit, 42 U.S.C. § 2000cc-2(a)(1), the   Religious Land Use and Interested Persons Act ("RLUIPA").

16.     Venue is proper in the Central District of California pursuant to   28

1  U.S.C. §1391(a)(1) and (2) because a substantial amount of the events giving rise
2  to the claims herein occurred in this judicial district.

### III.

### THE PARTIES

5      17.  Plaintiff Congregation Etz Chaim is a small congregation of
6  Chassidic Orthodox Jewish families, which currently meets for prayer services in
7  the Hancock Park area of Los Angeles at 303 South Highland Avenue, Los
8  Angeles, California.  Many families and members of Etz Chaim moved to
9  Hancock Park in reliance on the City's prior approval of religious prayer services
10  at 303 South Highland to live within walking distance to the *shul*, and many
11  congregants are physically unable to pray elsewhere in accordance with their faith.
12  Rabbi Chaim Baruch Rubin has been a resident of Hancock Park for 48 years and
13  has been the Rabbi of the Congregation since approximately 1990.

14      18.  Plaintiff Congregation Etz Chaim of Hancock Park is a religious non-
15  profit California corporation, and owns the residence at 303 South Highland.

16      19.  The objective of Etz Chaim is to have a house of worship within
17  walking distance of the homes of its congregants so that its members, including
18  the elderly, disabled, and families with small children, may fulfill the dictates of
19  the Chassidic Jewish Orthodox faith, which requires them to pray communally
20  with their families and other members of the faith twice daily during week days,
21  and three times daily on the Sabbath (Saturday), and on high holy days, and which
22  requires them to walk to services on the Sabbath. Etz Chaim is the only Chassidic
23  Orthodox *shul* in Hancock Park, and it is the only congregation that conducts its
24  services in the traditional Yiddish language.  The Congregation follows the
25  traditions of a particular Chassidic dynasty, known as Vishnitze.

26      20.  Defendant, the City, is a municipal corporation exercising
27  governmental functions under the laws of the State of California.

28      21.  The Zoning Administrator ("ZA") is the decision-maker on behalf of

8

the City of Los Angeles vested with the power and authority to grant or deny conditional use permits and variances from zoning ordinances, including, among other things, the power and authority to grant or deny a conditional use permit for a house of worship in an R1-1 residential zone, and variances incidental thereto, to a religious group such as Congregation Etz Chaim.

22.    The CAPC is the decision-making body charged with deciding appeals from the ZA's decision to grant or deny conditional use permits and variances from zoning ordinances, and is vested with power to reverse the ZA.

23.    The Los Angeles City Council ("City Council") is a decision-making body of the City of Los Angeles, vested by law with the power and authority, among other things, to overrule decisions of the CAPC to grant or deny conditional use permits and variances incidental thereto, to a religious entity such as Congregation Etz Chaim.

24.    Congregant Sam Menlo is 81 years old, and is physically disabled after having suffered two strokes several years ago, which affects his ability to walk. Mr. Menlo travels the five blocks from his home in Hancock Park to 303 South Highland where he has prayed with the Congregation for 16 years. Mr. Menlo is a survivor of the Holocaust and has lived in Hancock Park for over 40 years. If Mr. Menlo is not allowed to attend communal prayer services at 303 South Highland , he will be prevented from attending communal prayer services altogether, as he is physically unable to walk to any of the synagogues located outside of Hancock Park in the commercial zone because of his disability.

25.    Miriam Weiss is 85 years old and is physically disabled. If she is not allowed to attend communal prayer services at 303 South Highland, Mrs. Weiss will be prevented from attending communal prayer services altogether, as she is unable to walk to any of the synagogues located outside of Hancock Park in the commercial zone because of her disability.

26.    Congregant Hilda Mittelmann is 89 years old, and has been praying

with Congregation Etz Chaim for 25 years. Mrs. Mittelmann walks less than one block from her home to pray at 303 South Highland, which is the closest Chassidic Orthodox house of prayer to her home. Mrs. Mittelmann, a Holocaust survivor, is physically infirm, and cannot stand or walk long distances. If the Congregation is not allowed to pray at 303 South Highland, Mrs. Mittelmann is too elderly and infirm to attend prayer services at the nearest Chassidic Orthodox synagogue in the commercial zone, and therefore will not be able to engage in communal prayer as required by her Orthodox faith.

27. Congregants Morris and Ella Buchinger, are 91 and 88 years old, respectively, and walk approximately 13 blocks (or approximately 45 minutes one way) from their home to pray at 303 South Highland, which is the closest Chassidic Orthodox house of prayer to their home. Mr. Buchinger is a survivor of the Holocaust and has prayed with Congregation Etz Chaim for 36 years. If the Congregation is not allowed to pray at 303 South Highland, Mr. and Mrs. Buchinger are too elderly and infirm to attend prayer services at the nearest Chassidic synagogue in the commercial zone, and therefore will not be able to engage in communal prayer as required by their Chassidic Orthodox faith.

## IV.

## NATURE OF THE ACTION

28. This action is brought under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000-cc *et seq.* ("RLUIPA").

29. This is a civil action whereby Congregation Etz Chaim prays for preliminary and permanent injunctive relief enjoining the City of Los Angeles, its officers, agents, employees, and all the persons acting in concert or participation with them, from enforcing certain provisions of the City of Los Angeles' Municipal Code, promulgated and implemented by the City and applied against Etz Chaim, on the grounds that the provisions complained of herein violate civil rights embodied in RLUIPA in their application to the case at bar, by substantially

burdening Etz Chaim's rights of religious exercise at 303 South Highland by prohibiting it and its members from praying in accordance with the dictates of the Chassidic Orthodox faith, by arbitrarily and discriminatorily banning a religious use the City previously approved and defended, and by forcing congregants who are unable to walk to the commercial zone to abandon their religion or violate its tenets by driving to synagogues located outside Hancock Park. Further, the City's application of the Municipal Code to bar Etz Chaim from gathering to pray at 303 South Highland violates Etz Chaim's federally protected civil rights under RLUIPA to be free from discrimination in the land-use decision-making process by discriminating against and treating Etz Chaim on less than equal terms than those applied to secular uses and assemblies, and by totally excluding from an unreasonably limiting within Hancock Park Chassidic Jewish Orthodox houses of worship and communal prayer services that require a CUP.  In categorically denying not one but two CUP applications, in forcing congregants in the residential zone to walk to the commercial zone, and in effectively banning conditional synagogue uses and prayer gatherings in Hancock Park, the City has demonstrated that it will never allow the Congregation to gather and prayer *anywhere* in the Hancock Park residential zone in violation of RLUIPA.

30.     Congregation Etz Chaim further prays for declaratory judgment to determine the validity of the Municipal Code and of the City's actions in denying Etz Chaim the opportunity to exercise its federally protected rights of religious freedom and land use, free from discrimination, unequal treatment and substantial burden, and to declare the City's Municipal Code invalid under RLUIPA as applied.  Etz Chaim further prays for declaratory judgment to declare that the Municipal Code and the City's actions in denying Etz Chaim the opportunity to exercise its religious beliefs free from discrimination and substantial burden violate the Congregation's civil rights under RLUIPA.

31.     An actual controversy exists between the parties involving substantial

1   federal civil rights issues in that the challenged Municipal Code and the actions of
2   the City violate the rights of Etz Chaim guaranteed by RLUIPA.

3                                         **V.**

4                          **FACTUAL BACKGROUND**

5   **The Congregation**

6        32.    The act of gathering in communal prayer with others of the Orthodox
7   faith is a fundamental tenet of the Orthodox Jewish religion, which has been
8   practiced for thousands of years.  Orthodox Jewish Law requires that families pray
9   together three times on the Sabbath (Friday evening, Saturday morning, and
10  Saturday evening) and other holy days, and that a quorum of no less than ten men
11  (or "minyan") gather each weekday morning and evening for prayer.  Travel by car
12  is permitted for weekday services, but Orthodox Jewish law does not permit
13  worshipers to use or be transported by any mechanized form of transportation (for
14  example cars or standard elevators) on the Sabbath or on other holy days.  If
15  congregants cannot get to prayer services under their own power on the Sabbath or
16  other holy days, they are unable to pray communally as required by their religion.
17  Thus, in order to fulfill their religious dictates and beliefs, worshipers and their
18  families must live within walking distance of their houses of prayer.

19       33.    Since approximately 1970, the Congregation has been gathering for
20  prayer in a residence in the Hancock Park area of Los Angeles.  When the family
21  of Rabbi Abraham Rubin moved to the family home at 415 South June Street,
22  there were a handful Orthodox Jews in the community in need of a place to gather
23  and pray.  Some of these people, because they were elderly, disabled or had small
24  children, were unable to walk to the nearest synagogue, which was (and still is)
25  over half a mile beyond the western boundary of Hancock Park.  Rabbi Rubin thus
26  invited friends and neighbors who shared the Orthodox faith to pray with him at
27  his home.  During the approximately 25 years that prayer services were held at
28  Rabbi Rubin's home, the Congregation averaged forty (40) attendees for the

1   Sabbath and holy day services (to which everyone walked) and ten to fifteen (10-
2   15) attendees for week day services (to which driving was permitted).   Rabbi
3   Rubin's home was never used as a full-service synagogue.

4       34.   A substantial number of Etz Chaim's congregants, because of their
5   physical limitations, depend fundamentally on the existence of a place near their
6   homes where they may pray communally with others of their faith.  For example,
7   congregant Ella Buchinger is 88 years old.   She suffered a fractured spine
8   resulting from osteoporosis she contracted in concentration camps during the
9   Holocaust and is unable to walk long distances. Miriam Weiss is 85 years old and
10  can only walk with the assistance of a walker and with great difficulty.   In
11  addition, there are a number of families with very young children who are
12  physically unable to walk to services at more distant synagogues located outside of
13  Hancock Park.  For these individuals, and many others who are unable to walk to
14  the commercial zone, Etz Chaim is more than a mere convenience; it provides
15  them with the only opportunity they have to pray together as their faith requires.

16  **The Search For A New Location**

17      35.   In approximately 1990, Rabbi Rubin's health began to fail, and his
18  son, Rabbi Chaim Baruch Rubin, took over the leadership of the Congregation.
19  The younger Rabbi Rubin (hereinafter referred to as Rabbi Rubin) felt a spiritual
20  obligation to provide a suitable house of prayer for the Congregation and thus
21  began an eighteen-month search for a new location at which to hold prayer
22  services. The objectives of the Congregation's search were threefold:  first, to find
23  a location within walking distance of the Congregation's residences, keeping in
24  mind the walking distance limitations of the elderly, disabled and very young
25  members; second, to find a location on the ground floor (to allow disabled and
26  elderly members who cannot climb stairs and who cannot use standard elevators
27  on Sabbaths and other holy days to attend services); and third, to find a location
28  that would have the least possible impact on the Hancock Park community.

36.   The Congregation explored alternative locations, including what was then Whittier Law School, and which was located in Hancock Park and within walking distance for Congregation members.  The law school was unavailable to the Congregation for many reasons.  First, the law school was in the process of selling the property to Yavneh Hebrew Academy, which would allow existing worshipers to continue gathering at the law school but had indicated that it would not permit another congregation to commence services there.[1]  Second, the law school had allowed the use of a classroom on the second floor, which was not a feasible location for members who are elderly or have disabilities which prevent them from walking up a flight of stairs.  Third, while this classroom may have been sufficient for the ten then current worshipers, it is unlikely that it could have accommodated an additional forty worshipers on the Sabbath.  Fourth, the services held at the law school were of a different "denomination" than that of Congregation Etz Chaim.  Congregation Etz Chaim is a Chassidic denomination of the Orthodox faith, which among other distinguishing characteristics, is a more "strict" denomination and conducts prayers in a different manner than other Orthodox denominations.  Fifth, Orthodox Jewish law requires men and women to be separated during prayer services, and the then available classroom did not allow for there to be such a separation.  Sixth, the law school could not accommodate weekday services.  Finally, the law school was unsuitable for use by Etz Chaim because it did not provide the necessary religious setting and could not accommodate the religious artifacts necessary for prayer by the Congregation.

37.   The Congregation also sought out space in the commercial district south and west of Hancock Park but could find no suitable locations.  As a practical matter, these locations were too far away from the congregants' homes to

---

[1]   Currently, Yavneh operates a private religious day school and is permitted to hold strictly limited indoor prayer services for students and members of the "Yavneh Family."  Yavneh is not a house of worship open to the general public.

accommodate the needs of the members who are elderly, disabled or have young children. Moreover, because Orthodox Jews are forbidden to use any machines, including standard elevators, on the Sabbath and other holy days, only a first-floor location would suffice. To the Congregation's knowledge, there were no first-floor locations in the commercial areas suitable for use as an Orthodox house of worship within reasonable walking distance from the congregants' homes.

38.    After an eighteen-month search, the Congregation located the current residence at 303 South Highland Avenue. The residence appeared ideal for prayer services, as it was within walking distance of the homes of the congregants, could accommodate prayer services on the ground floor, was close to the western-most edge of Hancock Park, was located on the corner of one of the busiest (and noisiest) intersections of two secondary highways in Los Angeles (and likely the busiest in Hancock Park), and had ample public on-street parking.

39.    Once Etz Chaim located the Highland Avenue residence, the Congregation approached Los Angeles City Council President, John Ferraro, the councilman for the district, to inform him of its intention to use the residence for prayer services and to seek his advice. Councilman Ferraro advised the Congregation that while all of Hancock Park is zoned R1-1, and thus requires a conditional use permit for prayer gatherings, the Congregation would be better served by not seeking a conditional use permit, as the Congregation's use was unobtrusive and had been ongoing for nearly 25 years. The Councilman indicated that if the Congregation would get the signatures of all its abutting neighbors in support of the use, he would assist them in obtaining a conditional use permit without a hearing. Councilman Ferraro stated, however, that if neighborhood opposition to the use arose, he would not be in a position to support the granting of a conditional use permit to Etz Chaim. Etz Chaim thus proceeded to obtain the signatures of its neighbors approving the use of the Highland Avenue residence.

40.    Etz Chaim located the Highland Avenue residence and began holding

prayer services there in April 1995.   The Highland Avenue residence was dilapidated and had features which were in violation of the residential zoning ordinance (a fully paved front area and large fence), and which had been constructed by the prior owner.  Etz Chaim offered to remedy the nonconforming features in order to restore the beauty and full residential character of the house. The Congregation cleaned the front yard, which was filled with trash and junk cars, fixed broken windows, repaired leaking pipes and the ceiling which was falling apart, added lighting, installed air conditioning, repaired the fence in the rear, removed a rotting deck, removed a termite-infested garage which had become a safety hazard, added a bathroom, and painted and plastered.  The cost of these repairs and improvements was approximately $50,000.

41.    In approximately September 1995, the Congregation invited Councilman Ferraro and members of the Hancock Park Homeowners' Association (the "Association), including its president, James Wolfe, to visit the house in order to allow them to see first-hand the location and the activities of the Congregation. At that meeting, the Congregation assured the Association that it was willing to take all necessary steps to address any concerns the Association might have about the use of the property.

**The Nature Of The Congregation's Activities**

42.    The religious practices of Etz Chaim were unobtrusive and did not disturb the peace and tranquility of the neighborhood surrounding 303 South Highland Avenue.  Since 1995, Congregation Etz Chaim had been meeting for prayer services in the Highland Avenue residence.  During that time, the average Sabbath attendance (to which all congregants walk) was forty (40) members (with a high of sixty (60) members).  Weekday services (where driving is permitted) did not exceeds ten to fifteen (10-15) members.  Between 1995 and 1997, there had been four bar mitzvah services (the receptions and parties were held elsewhere), which took place on the Sabbath, and, as with regular Sabbath services, all

attendees were required to walk.   Also, because of the strict dictates of the Orthodox Jewish religion, no musical instruments, amplification or other sound enhancements were used during any services (which are always held indoors).  In addition, the residence was not operated as a full-service synagogue or temple, and the Congregation never had any intention of operating it as such.  Thus, there were no "community" services typically offered at a full-service institutional synagogue such as community outreach, a Hebrew school, a social hall, after-school activities, day care, adult education, bingo, and other programs.  The only activity that took place at the residence was communal prayer.

**Opposition By The Hancock Park Homeowner's Association**

43.    Several months after its September 1995 visit to the Highland Avenue residence, the Association voiced opposition to Etz Chaim's use of the property. The Association expressed concerns about a potential increase in traffic, potential noise problems, the aesthetically unappealing features installed by the previous owner which were in violation of the residential zoning ordinance (the paved front area and high fence), and worried that the exterior of the house would be altered in a way that would make it appear more commercial.  The Congregation assured the Association that it was willing to address these concerns, including correcting the features which violated the zoning requirements and maintaining the house's character as a residence.

44.    Ultimately, it became the Association's position that no location in Hancock Park would be suitable for the Congregation's prayer services.  They reasoned that because there had never been any CUPs of this nature granted in Hancock Park's 75-year history, they did not want to "set a bad precedent" by allowing communal prayer services in their neighborhood.

**The Zoning Law**

45.    The Highland Avenue property is in an R1-1 zone and as such is zoned for residential use under Municipal Code section 12.08.  Under Municipal

1  Code section 12.24(V)(9), certain conditional use of the property as a church or
2  house of worship is a lawful permitted use, however, the Congregation first must
3  obtain a CUP.   Other conditional uses are also allowed in R1-1 zones by
4  conditional use permit, such as child care facilities/nursery schools, private clubs,
5  fraternity/sorority houses and public schools, under Municipal Code §§
6  12.24(V)(51), (35), (21) and § 12.24(U)(24)(a) , respectively.

7  **The Denial of the Congregation's First Application for CUP**

8      46.    In 1996, in response to pressure by the Association, the Congregation
9  sought a CUP to continue prayer services at 303 South Highland.  At each stage of
10  the proceedings, the Congregation expressed its willingness to mitigate any
11  potential minor impacts of its use of the Highland Avenue residence.  Specifically,
12  in response to minor potential impacts raised by the City, Etz Chaim offered to,
13  *inter alia*, install double-paned windows, erect a fence or landscaping to provide a
14  noise buffer, and restore the residential character of the residence.   The
15  Congregation further noted that very little parking was needed to accommodate
16  the 10 or so congregants who drive to weekday services, and that all congregants
17  walk to services on the Sabbath and high holy days.  With respect to purported
18  traffic concerns, the Congregation responded that the *shul* is located at the
19  intersection of two secondary highways, Third and Highland - one of the busiest
20  intersections in the area with a daily traffic volume of 80,000 cars per day.

21     47.    In October 1996, the Zoning Administrator ("ZA") categorically
22  denied the Congregation's application for a CUP, a decision which was upheld by
23  the Board of Zoning Appeals ("BZA").

24     48.    In June 1997, the Planning and Land Use Management Committee
25  heard testimony regarding the denial of the CUP.  Most, if not all, of the
26  opposition to the CUP was based on the position that *no location in Hancock*
27  *Park* was suitable for the Congregation's prayer services, and that granting the
28  permit would "set a bad precedent" in Hancock Park because there have never

1   been any conditional use permits of this nature granted in Hancock Park's 75-year
2   history.  One committee member noted that none of the purported impacts was
3   unmitigatable and suggested the Congregation confer with the Association and
4   Councilman Ferraro to discuss a compromise.  The Association and Councilman
5   Ferraro refused to participate in any such discussions. The Association refused to
6   discuss mitigation measures because its position had not changed and *a*
7   *compromise with the Congregation was not possible.*  Similarly, Rene Weitzer,
8   Chief Deputy to Councilman Ferraro, stated that *because no set of conditions*
9   *would allay the Councilman's concerns*, he was unwilling to meet with Etz
10  Chaim.

11      49.    In July 1997, the full City Council conducted a hearing on Etz
12  Chaim's CUP application.    The City Council heard testimony from the
13  Congregation reiterating its willingness to address all of the City's land use
14  concerns.   The City Council also heard testimony from those opposed to the
15  granting of the CUP.  Those individuals again emphasized their central argument
16  that granting a CUP would set a bad precedent which would allow other houses of
17  worship to be established in Hancock Park. The City Council refused to consider
18  any of the Congregation's mitigation proposals and adopted the BZA's findings.
19  Specifically, despite that the Municipal Code expressly allows conditional uses in
20  an R-1 residential zone, the City Council found that:  (1) the property detracted
21  from the residential character of the "long established" and "well-maintained"
22  Hancock Park neighborhood; (2) there was no precedent in Hancock Park's 75-
23  year history that supports the granting of the use; (3) there were no other church
24  or institutional uses on nearby residentially zoned properties and a CUP would
25  compromise the 75 year "sought after ambiance of this historical, residential
26  neighborhood"; and (4) " the use would be a "precedent setting encroachment of
27  an institutional use" that could "destabilize what has been a long standing, quality
28  single-family residential neighborhood" and that "despite its central urban

location and the onslaught of high volume traffic, pollution and increasing crime; this use though seemingly benign and supportive of community values is, as a first institutional/commercial intrusion into a single-family residence, a potentially significant rent in the residential character of this neighborhood."

50.    In sum, the City denied the CUP on the basis that Hancock Park had never permitted a church use in its 75-year history and the City did not want to set a "bad precedent" by allowing religious services in an R-1 zone.

**The First Action and Court-Approved Settlement Agreement**

51.    The Congregation thereafter brought an action in this Court for declaratory relief and injunctive relief pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, Title VII of the Civil Rights Act of 1968, 42 U.S.C. § 3604, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, claiming, *inter alia*, that the City's demand for and denial of the Congregation's application for a CUP to allow limited private prayer services at 303 South Highland violated the Congregation's federally guaranteed statutory and constitutional rights of religious freedom. Congregation Etz Chaim v. City of Los Angeles, Case No. CV 97-5042 (HLH) (the "First Action"). The Congregation alleged that the demand for and denial of a CUP prohibited congregants from worshipping in accordance with the dictates of their Orthodox Jewish, which requires that they walk to services on the Sabbath and high holy days and that no suitable alternative locations exist within walking distance where elderly and infirm members can pray in accordance with their faith. The First Action was stayed pending resolution of the Congregation's state law claims, which were denied.

52.    In September 2000, Congress passed RLUIPA, which was based on congressional findings gathered over three years of hearings demonstrating widespread systematic discrimination against religious land use arising from the application of state and local zoning laws. Congress expressly found that local

land use entitlements, which are provided though a system of individualized assessments and virtually unchecked political discretion, were being withheld for religious land use in discriminatory ways.  The Congregation's spiritual leader, Rabbi Rubin, testified before Congress and his testimony, along with that of others who were denied the right to worship at the hands of local zoning authorities, was cited as one of the reasons why RLUIPA was passed.

53.   RLUIPA fundamentally changed the law and the way local zoning authorities regulate religious land use.  Now, local zoning authorities cannot deny a CUP for religious use of property if that denial will force a "substantial burden" on religious exercise, unless the denial is the least restrictive means necessary to further a compelling governmental interest.   Further, Congress expanded the dentition of "religious exercise" to include *religious land use* and provided that: "the *use, building, or conversion of real property for the purpose of religious exercise* shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose."  42 U.S.C. § 2000cc-5(7)(B) (emphasis added).  Thus, under RLUIPA, simply balancing a city's need to control local zoning against a general right to pray anywhere – for example, in the nearby commercial zone – is no longer adequate.  Rather, if the application of a local zoning law to religious land use substantially burdens or discriminates against free exercise, then RLUIPA preempts that law.

54.   In September 2000, the Congregation supplemented its complaint and alleged multiple violations of RLUIPA.  The Congregation alleged that the City's demand for and denial of a CUP for its limited religious use of 303 S. Highland imposed a substantial burden on religious exercise because the congregants were physically unable to walk to another location in the commercial zone, as their religions requires, and there were no suitable alternatives.  The Congregation also alleged that the CUP denial violated RLUIPA's equal terms and nondiscrimination provisions, as it had the effect of banning all conditional church uses in the

Hancock Park neighborhood, and because the City denied the CUP in large part because Hancock Park had never allowed by CUP a church use in its 75-year history, and the City did not want Etz Chaim to set a "bad precedent."

55. In November 2000, the Congregation's claims that the City's demand for and denial of a CUP constituted a substantial burden on the Congregation's rights of religious freedom in violation of RLUIPA survived the City's motion for judgment on the pleadings and were set for pretrial conference in June of 2001. This Court found that RLUIPA applied to the 1996 CUP denial, that there were triable issues of fact whether the City's demand for and denial of a CUP constituted a substantial burden in violation of RLUIPA, ordered the parties to engage in court-supervised settlement discussions, and set the matter for trial.

56. In September 2001, after several rounds of court-supervised settlement discussions, the City and the Congregation settled the RLUIPA claims and entered the court-approved Settlement Agreement. The Settlement Agreement allowed the Congregation to gather and pray at 303 South Highland subject to strict terms on the nature and scope of the services and the Congregation's obligation to remodel the house, and gave a full release of the RLUIPA claims. The City approved the use on the basis that it was a limited private use – and not an institutional "church" within the meaning of the Municipal Code – thus, no CUP was required. The Settlement Agreement was approved by this Court, the City Attorney and the City Council. For the eight years thereafter, the City maintained that the use of 303 South Highland did not require a CUP. This Court retained exclusive and continuing enforcement jurisdiction over the Settlement Agreement, the RLUIPA subject matter and the parties for five years. This Court later extended its exclusive jurisdiction for another five years until 2012.

57. The Settlement Agreement provided for limited religious use of the residence – it did not purport to allow a full-blown institutional synagogue, which

1    requires a CUP.  For example, it imposed strict restrictions on the hours during
2    which prayer services could take place, the number of congregants who could
3    gather to pray during weekday (15) and Sabbath (50) services, and the number of
4    cars (6) that could park within three blocks of the property.  The Settlement
5    Agreement categorically prohibited weddings, receptions, funerals, bar mitzvahs,
6    banquets, day care and fundraising.  The Settlement Agreement required the
7    Congregation to restore the residential character of the residence, install double-
8    paned windows, erect a fence, and landscape the property.

9        58.    The Congregation remodeled the house pursuant to and in accordance
10   with the terms of the court-approved Settlement Agreement an all applicable
11   zoning and building codes.  After a three month long review period, the City
12   approved the Congregation's building plans, which depicted the size and design
13   of the residence, and lawfully issued building and grading permits – the validity
14   and irrevocability of which were subsequently upheld by the Ninth Circuit Court
15   of Appeals when, after succumbing the pressure from the Association (which
16   objected vehemently to the settlement) the City attempted to revoke the permits it
17   previously issued in accordance with its own codes.  See Congregation Etz Chaim
18   v. City of Los Angeles, 371 F.3d 1122 (9th Cir. 2004).  The City further approved
19   the Congregation's plans to provide two parking spaces, and no more.  A
20   certificate of occupancy issued, and the Congregation continued lawfully
21   gathering to pray at 303 South Highland with the City's permission in accordance
22   with and pursuant to the Settlement Agreement's terms.

23       59.    The City never challenged the Settlement Agreement or the limited
24   religious use it allowed the Congregation to engage in.  The Congregation never
25   exceeded the scope of the Settlement Agreement's terms and the City never
26   contended otherwise - nor was the Congregation cited for code violations.

27   **The LRNA Action Invalidating the Settlement Agreement and Remand**

28       60.    While the City continued to allow the Congregation's prayer services

and defend the Settlement Agreement's terms, the Association did not stop trying to shut the Congregation down.

61.    In July 2003, a Hancock Park neighborhood group called the League of Residential Neighborhood Advocates ("LRNA"), which was comprised of members of the Association, among others, sued the City and the Congregation, claiming that the Settlement Agreement was invalid under state law because allowed a conditional use without a CUP.    See League of Residential Neighborhood Advocates v. City of Los Angeles, Case No. CV 03-04890 (CAS) ("LRNA Action").  This Court dismissed LRNA's claims on the basis that the Settlement Agreement represented a valid exercise of the City's power to settle land use litigation and that the agreement was not analogous to a CUP because it did not run with the land.  Because the issues were resolved on a motion to dismiss, this Court did not determine as a matter of fact whether the Congregation was "operating a synagogue" in violation of the LAMC.  Rather, the only issue at bar was the legal character of the Settlement Agreement.

62.    In August 2007, the Ninth Circuit reversed and held that the Settlement Agreement was void under state and local law because it purported to allow a conditional church use without going through the CUP process.  See LRNA v. City of Los Angeles, 498 F.3d 1052 (9th Cir. 2007).  The Ninth Circuit did not hold that the Congregation was in fact "operating a synagogue", nor did it find that the use of 303 South Highland was illegal.  The court construed the legal character of the Settlement Agreement under state law – not the legality of the Congregation's religious exercise under RLUIPA.  The Ninth Circuit's remand expressly contemplated that the Settlement Agreement as written could be validated and reinstated in one of two ways:  (1) if the City were to grant a CUP for the Congregation's religious use (or publicly and formally determine through the administrative process that the limited use does not require a CUP); or (2) upon findings by this Court that the City's demand for and denial of a CUP would

constitute an actual or potential violation of RLUIPA. Applying basic principles of preemption, the Ninth Circuit held that the CUP process could be lawfully circumvented if the application and enforcement of the Municipal Code to the Congregation's religious exercise to deny a CUP would violate federal law.

63.   Throughout the LRNA litigation, the City continued to vigorously defend the Settlement Agreement and its position that the Congregation's limited religious use in the R-1 zone was not a full-blown institutional synagogue use requiring a CUP under local law.

**The Congregation's Second Application for CUP**

64.   In February 2009, after several discussions with the City, and as part of a settlement plan, the Congregation submitted a second, supplemental application for a CUP so that the City would have the opportunity to publicly and formally approve through the administrative approval process the same limited religious use the City had approved in 2001, and defended in litigation for several years thereafter, and further so that the City could expressly consider whether the demand for and denial of a CUP would violate RLUIPA. The Congregation did not seek approval of a full-blown institutional synagogue use. Rather, the Congregation sought a CUP for *the exact same use the Settlement Agreement allowed*, and the City previously approved. The Congregation further sought a parking variance to maintain the two parking spaces the City previously allowed.

65.   In its application, the Congregation noted the limited private nature of the religious use at 303 South Highland. Because the congregants walk to services on the Sabbath and High Holy Days, *continuing the existing, previously-approved use* would not adversely affect parking and traffic. Approval of the application would require no change to the property or the remodeled residence, which remains located at the intersection of Third and Highland - two secondary highways and one of the busiest intersection in Los Angeles through which over 80,000 cars per day pass. Granting the application would serve the evolving

Orthodox community in Hancock Park, many of whom had relocated to Hancock Park to live within walking distance of the *shul*, and many others, including the elderly and infirm who are physically incapable of worshipping anywhere else in accordance with the dictates of their faith.  The application noted that every component of the property and its use was plan checked, permitted and approved by the City in accordance with the Municipal Code, and that since the Settlement Agreement, the City has taken no action against the Congregation for violation of its terms, or as a result of noise, traffic, parking or safety impacts.

66.    The Congregation adduced undisputed evidence that a categorical denial of a CUP would impose a substantial burden in violation of RLUIPA on congregants who remain too elderly and infirm to walk the additional distance to institutional synagogues in the commercial zone, and who have worshipped communally with Congregation Etz Chaim for many decades.  Congregants who are very old, disabled or who have small children, remain physically unable to walk to the nearest Chassidic Orthodox Synagogue beyond the boundary of Hancock Park.  Some congregants have moved to Hancock Park in reliance on the City's prior approval, to build their lives around the Orthodox community and to live within walking distance to the *shul*.  For many congregants who practice the Chassidic Orthodox faith, and who worship in accordance with its unique customs and traditions, *there simply is no suitable alterative location.*

67.    For example, Congregation Etz Chaim is the only congregation in the area that conducts its services in the Yiddish language, and it is the *only one that follows the traditions of a particular Chassidic dynasty, known as Vishnitze.* Its prayer service and liturgy follow a tradition that began with the customs of Rabbi Rubin's great-grandfather in Galicia, Poland.  The Congregation is a *special Chassidic sect of Judaism that is otherwise not practiced or observed in any nearby or surrounding area.*  The synagogues in the area, anywhere between one and two miles away from the Congregation do not accommodate the same Judaic

practices and beliefs as those of the Congregation's members, and are not suitable.

68.   Equally significant, the act of gathering in communal prayer with others of the Orthodox faith is a fundamental tenet of the Orthodox Jewish religion.   Orthodox Jewish Law *requires that families pray together* on the Sabbath, and that a quorum of ten men gather each weekday morning and evening for prayer.   Orthodox Jewish law does not permit worshipers to use or be transported by any mechanized form of transportation (for example, cars or standard elevators) on the Sabbath or on other holy days.   As such, if a person cannot get to prayer services under his or her own power on the Sabbath or other holy day, he or she will be unable to pray communally as required by the religion. Thus, in order to fulfill their religious dictates and beliefs, *families must live within walking distance of their houses of prayer*.   Walking to prayer services is a fundamental part of this the Chassidic faith and distinctive lifestyle, which further communicates that the Orthodox Jewish community is different from the surrounding community.   These basic tenets of the Orthodox faith are central and mandatory – congregants are simply not permitted to worship in any other way.

69.   Finally, the Congregation expended substantial resources remodeling the residence in accordance with the City's demands and, even if there were suitable alternatives in the commercial zone within walking distance of the congregants' homes (which there are not), forcing the Congregation to convert, sell or otherwise abandon services at 303 South Highland is not feasible.[2]

**Opposition by the Homeowner's Association and LRNA Plaintiffs**

70.   The Association and its members, some of whom were also plaintiffs in the LRNA Action, vigorously opposed the Congregation's second CUP application, just as they had done in 1996, on the basis that allowing the

---

[2]   Jewish Law prohibits Rabbi Rubin from closing his house of prayer without first locating a suitable alterative location, which cannot be done quickly or economically, if at all.  There are simply no alternatives within walking distance.

Congregation's continuing religious use would destabilize the pristine residential and historic character of Hancock Park, and that granting the CUP would set a bad precedent for future conditional uses, including institutional church and synagogue uses.  The Association and LRNA contended that congregants should not be permitted to gather to pray in the residential zone because there are other institutional synagogues in the commercial zone.   They opposed the CUP on grounds that *no religious use should ever be permitted in Hancock Park.*[3]

71.   Some members of the Association and LRNA are also members of the Greater Wilshire Neighborhood Council ("GWNC"), an advisory body that makes recommendations to the City of Los Angeles concerning land-use approvals in Hancock Park.  Certain members, including Cindy Chvatal, used their position to leverage opposition to the Congregation's application, without disclosing their status as plaintiffs in the LRNA Action, and voted to deny the CUP without providing the Congregation and full and fair noticed opportunity to respond.

72.   Some of these same members solicited sham plaintiffs, Esma and Michelle Younis, and financed a state court action seeking to permanently shut the Congregation down for failing to obtain a CUP, and maintained the action even while the Settlement Agreement was legally operative and then, later, while the second CUP application was pending.  Mrs. Younis's counsel, Michael Wright (a Hancock Park resident), was hired and paid by LRNA members, and was the primary opponent of the Congregation's CUP application.   Mr. Wright voluntarily dismissed his action in May 2009, after Mrs. Younis recanted her allegations against the Congregation.  Mr. Wright dismissed the action on the basis that he had secured assurances from the new City Attorney, Carmen Trutanich, that the City would enforce the Municipal Code to shut the Congregation down - although

---

[3]     LRNA is a "small group of concerned homeowners" that was formed out of "our belief that the situation that threatened Hancock Park was going to infect residential communities throughout the country." http://www.thelrna.org/president.htm (Message from President Leonard Hill).

Mr. Wright continued to assert the recanted claims in the CUP proceedings and to claim, falsely, that the Congregation operated a "full-service" synagogue.

73.   The Congregation's application for a CUP was thus opposed primarily by a small but politically powerful group of Hancock Park residents whose stated mission is to shut down the Congregation and totally exclude religious uses from the R-1 zone, and Jewish worshippers, from Hancock Park.[4]

74.   In the face of this, Rabbi Rubin met with Councilman Tom LaBonge to discuss mitigation measures and potential resolution, but Councilman LaBonge stated that he would not support the Congregation's use.   Rene Weitzer, Chief Planning Deputy for Councilman LaBonge vigorously opposed the Congregation's CUP application, and testified in the CUP proceedings on behalf of the Councilman.   Ms. Weitzer argued on behalf of Councilman LaBonge for a categorical denial of the CUP and stated that no mitigation measures or less restrictive alternatives should be considered because *nothing short of an outright ban on a synagogue use in the residential zone* would be acceptable in this case. Asserting the same grounds advanced in 1996, Ms. Weitzer stated that granting the CUP would be "precedent setting" and that "we believe in zoning."

**The Denial of the Congregation's Second Application for CUP**

75.   On October 9, 2009, eighth months after the public hearing, 17 months after the Congregation submitted its application, and three months after the new City Attorney, Carmen Trutanich, was installed, the ZA issued its decision denying the CUP.   There were over 400 letters or petition signatures in support of the CUP, and 130 in opposition.   The public hearing lasted for several hours and 125 witnesses appeared to testify.   The ZA categorically denied the CUP, and refused to consider any mitigation measures or less restrictive conditions on use.

---

[4]   Mr. Wright is also counsel for Concerned Residents of Hancock Park (comprised of some LRNA members), which was the primary opponent to the Yavneh Hebrew Academy's recent attempt to broaden the scope of the private indoor religious prayer services presently allowed at its day school.

76.   In denying the CUP, the ZA relied on the same factual allegations asserted by the primary project opponent, Esma Younis, concerning alleged noise, traffic and parking impacts, which had been previously recanted under oath.  The ZA cited purported traffic and parking impacts that would ensue as a result of the Congregation's request to hold religious services, weddings and receptions - not on an institutional synagogue basis - *but only to the same extent as any other private resident in Los Angeles*.  The ZA did not cite, nor did the City present, any objective evidence verifying the alleged impacts, such as noise and/or traffic studies, parking and/or traffic citations, or Municipal Code violations.   While the Congregation sought to *continue an existing use without change*, neither the ZA nor the City provided any evidence that, in fact, the Congregation had destabilized the residential character of Hancock Park or set a bad precedent for institutional church uses.  To the contrary, the evidence showed that home values in Hancock Park had skyrocketed since 1995, and to this day *the City has never allowed CUP for an institutionalized religious use to operate in Hancock Park.*

77.   The ZA acknowledged that congregants walk to services, but nevertheless found traffic and parking impacts dispositive.

78.   The ZA acknowledged that many of the congregants would be forced to walk further to services outside Hancock Park if the CUP is denied, but that alternative locations exist in the commercial zone where the Congregation could locate as a matter of right.  The ZA did not identify which locations he deemed suitable, how far away from each congregant's home the alternative site is located, and which of the congregants he deemed physically able to walk.  The ZA found that daily group gatherings were not "ordinary" in a residential zone and that because the additional distance to the commercial zone is a matter of *convenience*, denying the CUP does not impose *a substantial burden* under RLUIPA.  Because the City allows religious uses to locate in the commercial zone the ZA found the denial of a CUP to pray in the R-1 zone does not constitute a substantial burden,

1    regardless of the congregants' ability to walk.[5]

2    79.    The ZA found that while the Congregation serves many infirm and
3    elderly congregants who are unable to pray anywhere else, a larger number of
4    voices opposed the continuing use, and further that the Congregation's
5    institutional appearance (which was approved by the City in 2002) was not in
6    keeping with the residential character of Hancock Park. Specifically, the ZA
7    noted the significance of community support to "protect and improve the status
8    quo" with regard to the recent designation of Hancock Park as a Historic
9    Preservation Overlay Zone ("HPOZ"), and that granting a CUP would be
10   detrimental to the neighborhood's well-established single-family character.[6]

11   80.    The ZA asserted as a compelling governmental interest under
12   RLUIPA the City's interest in implementing a comprehensive zoning code that
13   promotes continued maintenance of "established single-family neighborhoods."

14   81.    On February 24, 2010, the Central Area Planning Commission
15   ("CAPC") held a hearing on the Congregation's appeal from the ZA's denial of
16   the CUP. Several witnesses appeared in support and in opposition. Councilman
17   Paul Koretz testified on behalf of the Congregation. The Association and Mr.
18   Wright were the primary opponents. Ms. Weitzer testified on behalf of
19   Councilman LaBonge and again urged an unconditional denial of the CUP on the
20   basis that *no set of conditions would be acceptable to the Councilman* and that no
21   religious use should be permitted by CUP in the Hancock Park residential zone.
22   The CAPC affirmed the decision of the ZA and denied the Congregation's appeal.

23   82.    No member of City Council moved under Los Angeles City Charter

24

25   [5]    The ZA also stated that the Orthodox Jewish religion allows elderly
     congregants to be driven to services on the Sabbath. That is patently false.

26   [6]    This finding is noteworthy because HPOZ status was conferred *after* 303
27   South Highland was remodeled and services began. The facts show that the
     Congregation did not detract from the residential or historic character of Hancock
28   Park, which was able to obtain the HPOZ designation despite the prayer services.

1   section 245 to review the CAPC's decision, which is now final.

2       83.    At each stage of the CUP proceedings, the Congregation raised their
3   claims that demand for and denial of a CUP to continue the limited religious use
4   the City previously approved would impose upon the Congregation and its
5   congregants a substantial burden in violation of RLUIPA, and would deprive them
6   of their federally protected rights to be free from arbitrary, discriminatory and
7   unequal treatment in the City's land use decision-making process.

8       84.    Given the City's unconditional denial and blatant failure to even
9   attempt to consider potential mitigation measures, and the fact that each of the
10  City's purported concerns regarding noise, traffic and parking may easily be
11  resolved, it is apparent that the real basis for the denial of the CUP was that no
12  conditional church uses should ever be permitted in Hancock Park's residential
13  zone, that all such uses must be relegated to the commercial zone regardless of the
14  substantial burden imposed on congregants; and, further, that Hancock Park's 90-
15  year-long "status quo" of excluding church uses must be preserved and promoted
16  to avoid setting a bad precedent.  These concerns thinly mask the City's true
17  discriminatory policies, and were the same purported concerns that gave rise to
18  RLUIPA nearly ten years ago.  This is particularly apparent given that numerous
19  nonreligious uses with equal or greater impacts are permitted within the Hancock
20  Park residential zone each year, attracting several hundreds of people, such as
21  schools, private clubs, book clubs, recreational facilities, and large political and
22  charitable fund-raisers.  While the Municipal Code expressly permits daily group
23  prayer gatherings, and even full-blow institutional churches and synagogues, in
24  the R-1 zone, the City has, again, succumbed to the political pressure of a small
25  group of powerful neighbors to disregard federal law, and its own prior promises.

26      85.    The City's failure to consider any mitigation measures (even while
27  congregants walk to services and park on a public street) or less restrictive means
28  rather than an outright ban on the Congregation's gatherings services, and its

failure to produce any objective evidence demonstrating the purported impacts, make it abundantly clear that it is the City's position that *no location within Hancock Park is available to the Congregation*, not because of the relative merits of any particular location, but because Hancock Park does not want Orthodox Jewish houses of prayer in its neighborhood.[7]   The City has made its position clear by denying not one but two applications for a CUP that it *will likely never approve a CUP to allow the Congregation to gather and pray anywhere in Hancock Park.*

86.   As several representative members of Etz Chaim testified at the two administrative CUP hearings, relocating their house of prayer to a more distant area would force them to forego practices central to their Chassidic Orthodox Jewish faith.   Their religion requires them to live with their families within walking distance to the Congregation, and many families have relocated to Hancock Park in order to worship in accordance with the dictates of their faith.

87.   The effect of the policy of not allowing houses of worship anywhere in Hancock Park discriminates against the Orthodox Jewish community by preventing the in-migration of Orthodox Jews into Hancock Park, especially the elderly, the infirm, and families with young children, in the R-1 zone.   For these individuals, the synagogues that are located further away from their homes in the areas zoned for religious uses as of right are simply not a viable option - even if those temples practiced the Chassidic dynasty of *Vishnitze* (which they do not). To suggest that the congregants can worship in another congregation or another *shul* would not only violate their rights to choose their place and manner of worship, it would be similar to insisting that Baptists worship in a Catholic congregation or that Mormons worship in a Greek Orthodox congregation.

88.   The City's categorical refusal to allow through the administrative

---

[7]   The ZA's failure to consider current traffic and/or noise studies and his denial of a parking variance based on building plans he never reviewed (and which were approved by the City in 2002) are but two examples of the City's abdication.

process the same limited religious use it approved through settlement, permitted in plan-check, and defended it litigation against third-party challengers imposes another unjustified substantial burden on the Congregation.   In forcing the Congregation and its members, who have relied in good faith on the City's approval for a decade, to disband and relocate, and in forcing them to bring this RLUIPA action after the City has enjoyed the benefits of a full release of the First Action, the City makes clear that discrimination, political manipulation and an unmitigable intent to totally exclude the Congregation from Hancock Park are the driving forces here - not the fair and neutral exercise of land-use discretion.  The City's true motives are further reflected in the total absence of objective findings to support its decision and in the manner in which the GWNC, a City agency, summarily voted to deny the CUP without a full and fair noticed hearing.

89.    If the City is permitted to shut down prayer services at the Highland Avenue residence, the Congregation and its members will suffer irreparable harm. Orthodox Jews have an obligation imposed by Jewish Law to pray every day, on the Sabbath and on holy days.  This communal prayer is fundamental to the fabric of Orthodox Jewish family life and the very existence of the Orthodox Jewish community.   If prayer services are shut down at 303 South Highland, the congregants' free exercise of religion will be substantially burdened.

## VI.

## FIRST CAUSE OF ACTION FOR VIOLATION OF RLUIPA:

## SUBSTANTIAL BURDEN

90.    Etz Chaim incorporates by reference the allegations contained in Paragraphs 1 through 89 as if set forth fully herein.

91.    The City's actions in categorically denying a CUP for the Congregation's previously approved limited religious use, and in prohibiting the Congregation from gathering to pray anywhere in Hancock Park imposes a unjustified substantial burden on the Congregation and its congregants' religious

1    exercise in violation of RLUIPA.  42 U.S.C. § 2000cc-2(a)(1) provides that:

2      No government shall impose or implement a land use regulation in a
3      manner that imposes a substantial burden on the religious exercise of
      a person, including a religious assembly or institution, unless the
4      government demonstrates that imposition of the burden on that
      person, assembly, or institution—

5            (A) is in furtherance of a compelling governmental
6      interest; and
            (B) is the least restrictive means of furthering that
7      compelling governmental interest.

8      92.   Municipal Code section 12.24(V)(9) as interpreted and applied
9 against the Congregation substantially burdens the Congregation's and the
10 congregants' free exercise of religion and religious beliefs in violation of RLUIPA
11 in that it has the effect of precluding development of an Orthodox house of
12 worship on *any* R-1 lot in the Hancock Park section of Los Angeles, it forces the
13 congregants unable to walk further to choose between moving out of their homes
14 in Hancock Park or abandoning their deeply held religious beliefs, and is prevents
15 the in-migration of Chassidic Orthodox Jews and families into the Hancock Park
16 community, especially the elderly, infirm and those families with small children.

17      93.   The City's actions in denying a CUP for a limited religious use it
18 previously approved and reliance upon which congregants have built their families
19 and established an intact Orthodox community in Hancock Park further impose a
20 substantial burden on the Congregation's and the congregants' religious exercise.
21 In categorically denying the Congregation's right to gather and pray not once but
22 twice, the City makes clear that it is not ever likely to allow the Congregation to
23 assemble and pray anywhere in Hancock Park, or to grant a CUP.  Forcing the
24 Congregation and its members to dismantle and disperse after a decade of express
25 approval imposes a substantial burden on religious exercise and violates RLUIPA.

26      94.   The City has failed to proffer any cognizable government interest
27 necessary to justify its substantially burdensome actions.  Generalized interests in
28 preserving the integrity of the residential zone by categorically requiring all prayer

services to relocate to the commercial zone are insufficient under RLUIPA. Even assuming the City had proffered a sufficiently compelling interest, its continuing refusal to consider mitigation measures, unconditional denial and outright ban on the Congregation's religious assembly and use in Hancock Park, fails to satisfy RLUIPA's least restrictive means test.

95. Municipal Code section 12.24(V)(9), as interpreted and applied against Etz Chaim, constitutes a violation of the substantial burden provision of RLUIPA, and if upheld and enforced, will cause the congregants to suffer hardship and actual and immediate irreparable injury. Etz Chaim and its members have no adequate remedy at law to correct the deprivations of their most cherished and fundamental of civil rights.

## VII.

## SECOND CAUSE OF ACTION FOR VIOLATION OF RLUIPA: EQUAL TERMS AND NONDISCRIMINATION

96. Etz Chaim incorporates by reference the allegations contained in Paragraphs 1 through 89, and 91 through 95, as if set forth fully herein.

97. As set forth above, the City allows nonreligious assemblies and institutions to locate and operate in Hancock Park without interference, and without demanding a CUP. The City allows without requiring a CUP many private nonreligious assemblies in Hancock Park, including, *inter alia*, private book clubs, private recreation clubs, large gatherings at consular homes, and schools. The City also permits full-blown nonreligious institutional uses, including private schools and academies (*e.g.*, Marlborough High School), with and without a CUP. The City's continuing unmitigated refusal to allow Etz Chaim to assemble and pray and/or to obtain a CUP for an synagogue use without interference to the same extent as nonreligious assemblies and institutions, and non-Jewish assemblies and institutions violates the equal terms and nondiscrimination provisions of RLUIPA.

98.     42  U.S.C.  §2000cc-2(b)  prohibits  unequal  treatment, discrimination and exclusion in the land use approval process, and it applies even where no substantial burden is imposed.  It provides that:

(1) Equal terms

No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

(2) Nondiscrimination

No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.

(3) Exclusions and limits

No government shall impose or implement a land use regulation that—

(A) totally excludes religious assemblies from a jurisdiction; or

(B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

99.     Los Angeles Municipal Code section 12.24(V)(9) requires houses of worship to get a CUP to operate within an R1-1 zone. However, as applied against the Congregation, this section violates RLUIPA as it amounts to an outright ban of private group worship and Chassidic Orthodox practice in Hancock Park's residential zone.  Such application of the Municipal Code denies the members of Etz Chaim equal treatment because similar nonreligious assemblies and uses which generate similar or significantly greater land use impacts, such as schools, private clubs and recreational activities are permitted in Hancock Park with a CUP.  Other nonreligious assemblies and uses such as book clubs, parties and adult education classes, including those with far greater impacts such as political fundraisers, location filming, and large gatherings at consular homes are allowed in Hancock Park as a matter of right.  Permitting nonreligious assemblies and institutions, but forbidding the Congregation's religious assembly and land use

violates the equal terms and nondiscrimination provisions of RLUIPA. The City's actions in permitting non-Jewish church assemblies and institutions in residential zones in the Wilshire Community Plan, while denying CUPs for Orthodox assemblies and institutions in Hancock Park also violates RLUIPA's prohibitions.

100.   The City's requirement of and refusal to issue a CUP results in a total ban on conditional synagogue and church uses in Hancock Park. The City's unconditional refusal to grant any CUP for religious use in Hancock Park in order to avoid setting a bad precedent and to preserve the residential and historic status quo is, in effect, a discriminatory denial on the basis of religion and the Chassidic Orthodox denomination in violation of RLUIPA. The City's categorical refusal to grant a CUP in this case, where congregants are unable to pray anywhere else as their faith requires, results in a total exclusion of and unreasonable limitation on Etz Chaim's religious assembly and the communal practice of the Chassidic Orthodox faith in Hancock Park.

101.   Municipal Code section 12.24(V)(9), as interpreted and applied against Etz Chaim, constitutes a violation of the equal terms and nondiscrimination provision  of RLUIPA, and if upheld and enforced, will cause the congregants to suffer hardship and actual and immediate irreparable injury. Etz Chaim and its members have no adequate remedy at law to correct the deprivations of their most cherished of civil rights.

## PRAYER FOR RELIEF

WHEREFORE, Congregation Etz Chaim prays for judgment as follows:

(a)     That this Court issue a Preliminary Injunction restraining the City, its officers, agents, employees, and all the persons acting in concert or participation with them from enforcing or threatening to enforce against Etz Chaim Los Angeles Municipal Code section 12.24(V)(9), which requires houses of worship to get a conditional use permit to operate within an R1-1 Zone, and that

said Preliminary Injunction shall enjoin the City, its officers, agents, employees, and all the persons acting in concert or participation with them from attempting to enforce Municipal Code section 12.24(V)(9) against Etz Chaim;

(b)   That this Court render a Declaratory Judgment declaring that Municipal Code section 12.24(V)(9), which requires houses of worship to get a conditional use permit to operate within an R1-1 Zone, as applied in this case to prohibit Etz Chaim from gathering to pray at 303 South Highland Avenue, violates RLUIPA, and is a real and invalid restriction upon Etz Chaim's rights;

(c)   That this Court issue a Permanent Injunction restraining the City, its officers, agents, employees, and all the persons acting in concert or participation with them from enforcing or threatening to enforce Municipal Code section 12.24(V)(9), which requires houses of worship to get a conditional use permit to operate within an R1-1 Zone, in any manner so as to obstruct Etz Chaim from exercising its civil rights to gather and pray in accordance with the dictates of the Chassidic Orthodox faith, and said Permanent Injunction shall enjoin the City, its officers, agents, employees, and all the persons acting in concert or participation with them from attempting to allow the complained of portions of the Code to be enforced against Etz Chaim;

(d)   That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy, in order that such declarations shall have the force and effect of final judgment;

(e)   That this Court retain jurisdiction of this matter for the purpose of enforcing this Court's order;

(f)   That this Court award Etz Chaim the reasonable costs and expenses of this action, including attorneys' fees pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000cc-2(a);

(g)   That this Court award appropriate compensatory damages, to be proven at trial, including damages for the deprivation of federally protected

1  civil rights, and expenses incurred as a result of the City's illegal actions,

2  including costs incurred in seeking a CUP the City never intended to grant; and

3          (h)     That this Court grant such other and further relief as this Court

4  deems equitable and just in the circumstances.

5
   Dated:  March 2, 2010                          FISCHBACH & FISCHBACH
6                                                 A LAW CORPORATION

7
                                                  By
8                                                      JOSEPH S. FISCHBACH
                                                       Attorneys for Plaintiffs
9                                                      Congregation
                                                       Etz Chaim and Congregation Etz
10                                                     Chaim of Hancock Park

11                          **DEMAND FOR JURY TRIAL**

12         Congregation Etz Chaim, and the individual members thereof, and

13  Congregation Etz Chaim of Hancock Park, hereby demand a trial by jury of all the

14  claims triable by jury asserted herein.

15
   Dated:  March 2, 2010                          FISCHBACH & FISCHBACH
16                                                 A LAW CORPORATION

17
                                                  By
18                                                     JOSEPH S. FISCHBACH
                                                       Attorneys for Plaintiffs
19                                                     Congregation
                                                       Etz Chaim and Congregation Etz
20                                                     Chaim of Hancock Park

21

22

23

24

25

26

27

28